# STATE OF MICHIGAN

# COURT OF APPEALS

---

MICHAEL GRAY,

      Plaintiff/Counter-Defendant-
      Appellee,

v

COLLEEN MARIE BEATTY-GRAY,

      Defendant/Counter-Plaintiff-
      Appellant.

UNPUBLISHED
October 28, 2014

No. 317556
Livingston Circuit Court
Family Division
LC No. 11-045636-DM

---

Before: METER, P.J., and WHITBECK and RIORDAN, JJ.

PER CURIAM.

Defendant, Colleen Marie Beatty-Gray, appeals as of right the trial court's July 15, 2013 judgment of divorce granting a divorce to plaintiff, Michael Gray. The judgment awarded the parties joint physical and legal custody of their three minor children, awarded Beatty-Gray spousal and child support on the basis of an imputed income of $60,000 a year, awarded Gray 10.63% of Beatty-Gray's personal injury claim, and required the parties to pay their own attorney fees. We affirm in part, reverse in part, and remand.

## I. FACTS

### A. BACKGROUND FACTS

Gray filed for divorce on December 27, 2011, alleging a breakdown of the marital relationship. At the time of the divorce judgment, Gray and Beatty-Gray had three children. On February 24, 2012, Beatty-Gray filed a countercomplaint seeking spousal support during the divorce, a mutual restraining order on the parties' joint accounts, and attorney fees.

Gray testified that the parties lived "check to check" and used credit cards to stretch purchases until his yearly bonus. Gray testified that he made a budgeting worksheet four or five years before that showed that they were "[i]n the hole about $40,000 or $50,000 a year." They made up the difference with Gray's bonuses, inheritances, or by selling investments.

-1-

## B.  THE PARTIES' INCOMES

Gray testified that he makes $144,000 a year at his employment with an automotive parts supplier.  He also receives a bonus of 0% to 40% on the basis of the company's performance.

Beatty-Gray testified that she is a chiropractor who works for her father.  Beatty-Gray's father owns Beatty Chiropractic.  In the past she made over $60,000 a year.  Beatty-Gray was injured in a slip and fall in February 2010.  She had a rod and plate installed in her ankle.  It took Beatty-Gray nine months to walk without crutches and she continued to experience tingling and numbness in her foot.

According to Beatty-Gray, the injury prevents her from seeing patients.  She works 15 to 18 hours a week, but working causes her to limp.  Beatty-Gray testified that she made $11,000 in 2012, $26,000 in 2011, and $19,000 in 2010.  Beatty-Gray also testified that she works for free when the clinic has financial problems in order to maintain her practice.

According to Gray, before he filed for divorce, Beatty-Gray was paid $1,500 every two weeks.  Beatty-Gray had been working full-time "for over a year" as of June 2012.  Beatty-Gray's injury did not significantly limit her activities and she had performed a chiropractic adjustment on him without expressing any pain.  Gray overheard Beatty-Gray and Beatty-Gray's mother talking about how Beatty would "stop paying [Beatty-Gray] and just tell them that dad's business is doing bad . . . ."  Gray testified that he had done a brief internet search and found job offers for chiropractors ranging up to $112,000.

## C.  ATTORNEY FEES

Beatty-Gray testified her attorney charged $200 an hour and she owed $31,125.53 in attorney fees.  Beatty-Gray testified that she owed the computer forensics expert $2,500 and owed a child's counselor $400.  On the basis of their disparate incomes, Beatty-Gray requested that Gray pay her costs and attorney fees.

## D.  ABUSE AND DOMESTIC VIOLENCE ALLEGATIONS

Gray testified that, before he filed for divorce, he had never been referred to Children's Protective Services or had police called to his house.  According to Gray, on March 25, 2012, he and Beatty-Gray met with a marriage conciliator.  Gray informed the conciliator that there was no possibility of reconciliation, and Beatty-Gray immediately became hostile and insulting.

Bonnie J. Miller, the parties' conciliator, reported that the parties were initially civil, but when Gray stated that he wanted a divorce, "[Beatty-Gray] became much more critical of his behavior and suggested that he may have a mental problem . . . ."  Miller further reported that Beatty-Gray then began to "describe physical, verbal and emotional abuse from [Gray] throughout the marriage just minutes after expressing that she did not want to be divorced from him."

Gray testified that, four days after the conciliation, Beatty-Gray called the police and accused him of domestic violence.  Beatty-Gray testified that Gray grabbed her arm and started

twisting it after she found notes in his car. The trial court entered an ex parte personal protection order. Gray was never arrested or charged with domestic violence.

On April 10, 2012, Beatty-Gray moved for temporary sole custody. Beatty-Gray testified that Gray was physically abusive to the children. Beatty-Gray testified that she and the children were afraid of Gray because he could go into uncontrollable rages. Jodie Hutcheson, Beatty-Gray's sister, testified that on one incident, Gray scared the parties' son by coming to the daycare window and pounding on it.

Gray testified that he was referred to Dr. Douglas Park to have a psychological examination. Gray testified that Park stated in his report that Gray based his decisions on emotion and reacts impulsively. Park opined that this "does not mean that he would be abusive, but does make it more likely that he could be."

Gray testified that his method of discipline was to take things away from the children or put them in their room. Gray testified that he never abused the children and that Children's Protective Services never found that he acted inappropriately. A July 17, 2012 Children's Protective Services report indicated that there was no preponderance of the evidence to support the physical abuse allegations against Gray. The report indicated that the children did not disclose any incidents of physical abuse during forensic interviews.

Gray's sister, Sue Miller, testified that Gray and the children stayed with her for six months in the summer of 2012. Miller testified that Gray had a good, loving, respectful relationship with the children. Gray was always patient and calm with the children, and he was firm with them but did not raise his voice. Miller saw Gray send the son to his room when he was being rude at dinner.

John Gray, Gray's brother, testified that Gray had a great relationship with the children. Gray brought the children to John Gray's boat for tubing on three or four weekends in the summer of 2012. The children took turns sitting in Gray's lap, sitting with him, and they all wanted him to ride the tubes with them. Gray was firm with the children without raising his voice. Nancy Paige, Gray's sister, testified that she has never seen Gray raise his voice with the children. The children were always happy to see him, but the older daughter seemed upset about the divorce.

Gray testified that his relationship with his children became "up and down" when he filed for divorce. Gray testified that the relationship deteriorated in January 2013, when his daughters stopped coming to see him.

Terry Mackenzie testified that she is the younger daughter's therapist. The younger daughter reported that Gray made her uncomfortable by kissing her face all over, squeezing her, and crying on her. The daughter stated that she was afraid that Gray would steal her. The daughter also reported that Gray once chased her and her sister and scared them, and that he once put her in the trunk of his car and kissed her. Gray denied that these incidents happened, and testified that he drives an SUV that does not have a trunk.

Mackenzie admitted that Beatty-Gray was present with the daughter during her initial assessment and first therapy session. Mackenzie admitted that she received quite a bit of input

on the daughter's attitudes and behaviors from Beatty-Gray, and that she had not spoken to Gray. Mackenzie did not have a plan to repair the daughter's relationship with Gray.

Robert Martin testified that he is the older daughter and the son's therapist. Martin testified that the older daughter has anger and anxiety issues, has described instances of physical punishment, and is worried about her siblings' safety. Martin testified that he would "like to think that in the long run things could be healed and normalized in her relationship with her father."

Martin testified that the son has anger and anxiety issues and presents with oppositional behavior, such as throwing tantrums and mistreating family pets. Martin testified that the son has a "loyalty conflict" and blames himself for the divorce.

## E. PORNOGRAPHIC MATERIAL

Wayne Hopkins, a security consultant and computer forensics expert, testified that he analyzed the three children's tablets. He found pornographic photographs in the com.google.android.YouTube files on each tablet. The photographs came from YouTube. A cache file is generated automatically whenever an image is viewed. The user did not intentionally save the images. Hopkins used forensic tools to go into the file systems of the tablets to extract the images from the data folders. The process took about two or three hours.

Gray testified that he had not downloaded anything onto the children's tablets from YouTube. Gray testified that he did not recognize any of the pornographic images. Gray testified that he had looked into "the Bashara case which had a lot of S and M stuff related to it . . . ." Gray testified that YouTube would cache pictures from related videos that it loaded even if you did not attempt to pull them up.

A Children's Protective Services Report dated August 14, 2012, found that there was no evidence to suggest that the children were exposed to the pornographic images and found no evidence of neglect or improper supervision. The reporter "noted that the complaint appears to be the result of a bitter custody and divorce dispute."

On October 5, 2012, on the basis of the pornographic images and allegations of physical abuse, the trial court awarded temporary custody to Beatty-Gray and ordered Gray to undergo counseling and a psychological evaluation for sexual addiction. The trial court found that Gray's use of the children's computers to seek out pornographic issues raised a concern about Gray's ability to provide the children with moral guidance. It was concerned that he lacked insight into the children's needs and placed his own needs over those of the children. The trial court ordered Gray to receive an evaluation for sexual addiction and to follow any recommendations of the counselor. At trial, Gray testified that the counselor indicated that Gray was not a sexual addict and had no issues.

## F. PARENTING

Gray testified that he was heavily involved in the children's lives and was the primary person who drove them to extracurricular activities. He put them to bed and gave them baths half the time, and participated in every activity. According to Gray, he was the one "who

told [the older daughter] to do her homework or go to bed" and he would ground her if she did not do her chores. Gray testified that both he and Beatty-Gray helped the children with homework. Beatty-Gray testified that she was the one who took the children to their appointments, drove them to the majority of their activities, made their lunches, bathed them, went to conferences and interfaced with teachers, and purchased their clothing.

Gray testified that he lived with Miller from March 2012 until October 2012 and then moved into the parties' rental house. Gray was actively looking for housing in the Brighton School District. Gray testified that Beatty-Gray had lived with her parents and then lived in her parents' rental house.

According to Gray, the older daughter mimicked statements that Beatty-Gray had made to him about the divorce and that she believed he was at fault for causing the divorce. His relationship with the older daughter began to deteriorate on January 23, 2013, when he was driving the kids to his house for a parenting visit. The older daughter had not come to parenting time since. Gray testified that he misses his daughters "[e]xtremely."

According to Gray, the younger daughter has been "pretty distraught since then." Gray still has parenting time with the son. The son had told him that the older daughter and the younger daughter had written "bad songs about [Gray] and sang them in front of the family," and Beatty-Gray and Beatty-Gray's parents had laughed. Beatty-Gray testified that she was not sure about the incident and that "kids sing songs here and there." She had not laughed at any song.

Beatty-Gray testified that she wanted the children with her "at all times if possible." Gray testified that he wanted therapeutic supervised parenting time because 50/50 parenting time would not work "currently" and some sort of transition period would be better. Gray wanted to start seeing the girls a few hours at a time and expand that to weekends and overnights.

Gray testified that he had signed up for the court's Our Family Wizard website, which allows families to communicate, post schedules, post report cards, and allow counselors and lawyers to read the conversations. Gray sent Beatty-Gray an email in which he stated that he hoped Beatty-Gray would agree to sign up for the Family Wizard. Beatty-Gray responded, "stop, leave me alone."

Gray testified that Beatty-Gray instead used the children to pass notes. According to Gray, "[the younger daughter] was very upset when I didn't return one of them because she said she was gonna get in trouble if she didn't bring the file back that night." Beatty-Gray testified that she did not see anything wrong with passing notes.

## G. THE TRIAL COURT'S FINDINGS AND CONCLUSIONS

When determining the children's custody, the trial court found that the girls had an established custodial environment with just Beatty-Gray, and that the son had an established custodial environment with both Gray and Beatty-Gray. Accordingly, the burden of proof to establish the son's custody was a preponderance of the evidence, but the burden of proof to establish the girls' custody was clear and convincing evidence.

Regarding the best interest factors, the trial court found that the love, affection, and emotional ties of the children slightly favored Beatty-Gray because the daughters' relationship with Gray was "conflicted and estranged." It also found that the ability to provide the children with moral guidance slightly favored Beatty-Gray because Gray's decision to view pornographic images on the children's tablet showed poor judgment, though it did not affect his ability to parent the children. The trial court found that Beatty-Gray's allegations of domestic violence and abuse were not credible, and found that the remainder of the other factors equally favored the parties. The trial court also extensively considered the children's psychological states and the testimony of the children's counselors.

The trial court concluded that joint physical and legal custody would be in the children's best interests. It reasoned that the children's estrangement from Gray did not begin until January 2013. This estrangement provided clear and convincing evidence that changing the children's custodial environment would be in their best interests. The trial court found credible Martin's recommendation that family therapy could repair and restore the children's bond with Gray.

For the purposes of child support and spousal support, the trial court imputed Beatty-Gray an income of $60,000 a year. It found that Beatty-Gray had an unexercised ability to earn on the basis of her education, prior employment experience, history, current physical ability, availability to work, and her diligence in seeking other employment. It found "no credible evidence" to support Beatty-Gray's claim that she was unable to work.

The trial court awarded Gray 10.63% of any award that Beatty-Gray might receive as a result of her slip and fall claim. The trial court denied Beatty-Gray's request for attorney fees.

## II. CUSTODY

### A. STANDARD OF REVIEW

This Court must affirm the trial court's findings of fact related to matters of custody unless they are against the great weight of the evidence.[1] The trial court's factual findings are against the great weight of the evidence only if the evidence "clearly preponderate[s] in the opposite direction."[2] This Court reviews the trial court's discretionary custody award for an abuse of discretion.[3] The trial court abuses its discretion when its decision falls outside the range of principled outcomes.[4]

---

[1] *McIntosh v McIntosh*, 282 Mich App 471, 475; 768 NW2d 325 (2009); MCL 722.28.

[2] *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010) (alteration in original), quoting *Fletcher v Fletcher*, 447 Mich 871, 879; 526 NW2d 889 (1994).

[3] *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008).

[4] *Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992); *Ewald v Ewald*, 292 Mich App 706, 725; 810 NW2d 396 (2011).

## B. LEGAL STANDARDS

The trial court must make its custody determination on the basis of the children's best interests.[5] To determine what is in the child's best interests, the trial court must consider the following factors:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(l) Any other factor considered by the court to be relevant to a particular child custody dispute.[6]

---

[5] MCL 722.25(1). See *Berger*, 277 Mich App at 705.

[6] MCL 722.23.

## C.  BEST INTEREST FACTORS

Beatty-Gray contends that the trial court erred when it failed to find that each best interest factor favored her.  The trial court found that factors (a) and (f) slightly favored Beatty-Gray, that factors (b), (c), (d), (e), (g), (h), and (k) favored neither party, and that factor (j) favored Gray.  Beatty-Gray asserts that the trial court erred when it found that the parties were equal on most factors because she was a more involved parent than Gray and because Gray was abusive and violent.  Beatty-Gray also contends that the trial court erred when it found that Gray was more likely to facilitate a parent-child relationship between the children and the other parent.  We disagree.

This Court typically declines to overturn the trial court's credibility determinations and its determination regarding the weight of the evidence.[7]  Here, both parties testified about their involvement in the children's day-to-day lives and extracurricular activities.  Gray testified that he was involved in the children's lives, and Beatty-Gray testified that he was not.  Ultimately, the trial court found that both parties were involved as parents and provided the children with guidance.  Given the conflicting evidence, we are not definitely and firmly convinced that the trial court made a mistake.

Beatty-Gray also testified that Gray was violent and abusive.  Gray testified that he was not violent and abusive, and that he disciplined the children with time-outs and removal of privileges.  Gray's family members corroborated his testimony.  Two Children's Protective Services reports indicated that the investigators found no evidence of physical abuse, neglect, or improper supervision.  The trial court also rejected Beatty-Gray's assertions of domestic violence and abuse because it found that her assertions were not credible.  The trial court specifically questioned the timing of Beatty-Gray's abuse allegations, which began four days after Gray indicated that he did not intend to reconcile with Beatty-Gray.  The trial court also found "significant" the timing of "not one, but two reports to CPS which were both unsubstantiated[.]"  Given the conflicting evidence in the record, we are not definitely and firmly convinced that the trial court made a mistake when it found that the parties were equal on the majority of the best interest factors.

Finally, Gray testified that Beatty-Gray used the children to pass negative and demeaning notes and refused to participate in the Our Family Wizard.  Gray testified that Beatty-Gray encouraged the children to disparage Gray.  Beatty-Gray denied encouraging the children to disparage Gray and testified that she did not see anything wrong with using the children to pass notes.  Again, the trial court's finding hinged on its evaluation of the parties' credibility and the weight of the evidence.  We are not definitely and firmly convinced that the trial court's finding that Gray was more willing and able to foster and encourage a close parent-child relationship with the children and Beatty-Gray was a mistake.

---

[7] MCR 2.613(C); *Berger*, 277 Mich App at 711.

## D. ULTIMATE CUSTODY AWARD

Beatty-Gray also contends that the trial court erred when it awarded the parties joint physical and legal custody. Beatty-Gray asserts that the trial court should have awarded her sole physical and legal custody on the basis that she was the more appropriate parent. We disagree.

Beatty-Gray bases her assertion on her own reweighing of the best interests factors. However, for the reasons described above, we decline to overturn the trial court's findings on those factors.

Further, the trial court has discretion to afford different weight to different best interest factors.[8] Here, the trial court extensively considered the children's best interests and other factors before awarding joint physical and legal custody. The trial court considered several factors under "any other factor," including Martin's recommendation that the children's needs must come first, and Martin's belief that family reunification therapy could restore the children's relationship with Gray.

Here, Miller testified that she lived with Gray and the children for six months, and that he had a loving relationship with the children. John Gray testified that Gray brought the children tubing at his house three or four weekends in the summer of 2012, and the children were always happy to see him, though the older daughter was upset about the divorce. Children's Protective Services investigated Gray twice, culminating in the July 17, 2012 report finding no evidence of physical abuse and the August 14, 2012 report finding no evidence of neglect or improper supervision. In June or July of 2012, Children's Protective Services forensically interviewed the children. The interviews revealed no evidence of abuse or neglect.

By the time of trial, however, the younger daughter was reporting to her therapist that she was feeling abused, the older daughter was recounting incidents of physical abuse to her therapist, and the son was acting out. In January 2013, the girls refused to continue visiting Gray. Evidence at trial indicated that Beatty-Gray was encouraging the children to disparage Gray, that her domestic violence accusations against him were not credible, and that she used the children to pass demeaning notes.

The trial court found that the girls' estrangement from Gray did not begin until January 2013, which was notably after the trial court awarded Beatty-Gray temporary sole custody in October 2012. The record supports the trial court's determination that the children had a positive relationship with Gray until January 2013. The record also supports the trial court's determinations that the children's relationship with Gray deteriorated afterward. Finally, the testimony of the children's therapists supported that the children were suffering because of the parents' antagonistic relationship.

The trial court found that the children's estrangement provided clear and convincing evidence that their established custodial environment needed to change. Given the record in this

---

[8] *Berger*, 277 Mich App at 705.

case, we are not convinced that the trial court's award of joint physical and legal custody fell outside the principled range of outcomes.

### III. IMPUTED INCOME

#### A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion the trial court's discretionary decision to impute income to a party.[9] The trial court abuses its discretion when its decision falls outside the range of principled outcomes.[10] This Court reviews for clear error the trial court's findings of fact concerning spousal support,[11] and reviews for clear error the trial court's factual findings underlying its child support determination.[12] The trial court's finding is clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake.[13]

#### B. LEGAL STANDARDS

The objective of spousal support is to balance the incomes and needs of the parties in a way that is just and reasonable under the circumstances of the case.[14] The trial court may consider imputed income when determining spousal support.[15]

"A child has an inherent right to parental support."[16] The purpose of child support is to meet the child's needs.[17] The trial court must presumptively follow the Michigan Child Support Formula when calculating child support.[18] When doing so, the trial court may calculate imputed income as well as actual income.[19]

The trial court imputes income when it "treat[s] a party as having income or resources that the individual does not actually have."[20] The trial court usually imputes income when the

---

[9] *Carlson v Carlson*, 293 Mich App 203, 205; 809 NW2d 612 (2011).

[10] *Id*.; *Ewald*, 292 Mich App at 725.

[11] *Gates v Gates*, 256 Mich App 420, 432; 664 NW2d 231 (2003); *Beason v Beason*, 435 Mich 791, 805; 460 NW2d 207 (1990).

[12] *Sparks*, 440 Mich at 151.

[13] *Carlson*, 293 Mich App at 205.

[14] *Berger*, 277 Mich App at 726.

[15] See *Loutts v Loutts*, 298 Mich App 21, 34; 826 NW2d 152 (2012).

[16] *Evink v Evink*, 214 Mich App 172, 175-176; 542 NW2d 328 (1995).

[17] *Id*.

[18] MCL 552.605(2); *Stallworth v Stallworth*, 275 Mich App 282, 285; 738 NW2d 264 (2007).

[19] *Carlson*, 293 Mich App at 205.

[20] *Stallworth*, 275 Mich App at 285 (quotation marks and citation omitted).

party has voluntarily reduced their income or has a voluntary, unexercised inability to earn.[21] For the purposes of imputing income when determining child support, the trial court must consider the party's (1) prior employment experience; (2) education level; (3) physical and mental disabilities; (4) the presence of the parties' children in the home and the effect on the party's earnings; (5) availability of employment in the local area; (6) the prevailing wage in the local area; (7) the party's special skills or training; (8) whether there is any evidence that the individual is able to earn the imputed income.[22]

## C. APPLYING THE STANDARDS

Beatty-Gray contends that the trial court erred by awarding her spousal support and child support on the basis of an imputed, rather than an actual, income. We conclude that the trial court did not abuse its discretion when it imputed income to Beatty-Gray.

Beatty-Gray testified that she was a chiropractor who works for her father and that, in the past, she had made over $60,000 a year. Beatty-Gray also testified that when the clinic had financial problems, she would work for free. Beatty-Gray testified that she was injured when she fell in February 2010, and that this injury prevented her from seeing patients.

Gray testified that he had overheard Beatty-Gray and Beatty talking about how they intended to "deficit" her income by not paying Beatty-Gray and saying that Beatty Chiropractic business was doing poorly. During a brief internet search, Gray found job offers for chiropractors ranging up to $112,000 a year. Gray also testified that Beatty-Gray was not significantly limited in her abilities and had performed a chiropractic adjustment on him after her accident.

The trial court considered a variety of factors when deciding to impute income, including Beatty-Gray's education, prior employment, history, current physical ability, availability to work, diligence in seeking other employment, and impact of the children in the home. The trial court also considered that Beatty-Gray had recently significantly reduced her income "compared to the period that preceded the filing of the initial complaint . . . ." The trial court found that Beatty-Gray had an ability to work, and found no credible evidence of Beatty-Gray's inability to work. The trial court found that Beatty-Gray had a professional degree and worked for "a number of years" in a professional capacity.

This Court defers to the trial court's determinations of credibility.[23] Here, Beatty-Gray testified that she has made $60,000 a year four years before, and Gray testified that he found local job openings ranging up to $112,000 a year. The parties' testimony directly conflicted on Beatty-Gray's ability to work. The trial court resolved the conflicting evidence in favor of Gray

---

[21] *Id.*

[22] *Carlson*, 293 Mich App at 206.

[23] MCR 2.613(C); *Berger*, 277 Mich App at 711.

-11-

because it found Gray's testimony more credible than Beatty-Gray's. We defer to the trial court's credibility determination.

Because the trial court considered the proper factors before imputing income to Beatty-Gray and because testimony at trial supported its findings, we are not convinced that the trial court's decision to impute income to Beatty-Gray fell outside the principled range of outcomes.

## IV. AWARD OF BEATTY-GRAY'S PERSONAL INJURY CLAIM

### A. STANDARD OF REVIEW

When reviewing a judgment of divorce, this Court reviews the trial court's factual findings for clear error and then determines "whether the dispositive ruling was fair and equitable in light of those facts."[24] We should affirm the trial court's dispositive ruling unless we are definitely and firmly convinced that the division was inequitable.[25]

### B. LEGAL STANDARDS

The trial court's primary objective in a divorce proceeding is to "arrive at a property settlement that is fair and equitable in light of *all* the circumstances."[26] The trial court must determine the property rights of the parties in a judgment of divorce.[27] The trial court may award the parties real property, personal property, or "the value thereof, to be paid by either party in money."[28] A right of action is personal property that the trial court may distribute as part of the marital estate.[29]

Before dividing the parties' property, "a trial court must first make specific findings regarding the value of the property being awarded in the judgment."[30] "[T]he trial court is obligated to make such a valuation if the value is in dispute."[31] The trial court may base its determination on expert testimony, lay testimony, or the parties' testimony.[32] But the trial court should not include an asset in the marital estate if there is no proof of the asset's value:

---

[24] *Sparks*, 440 Mich at 151-152.

[25] *Id*. at 152.

[26] *Boonstra v Boonstra*, 209 Mich App 558, 563; 531 NW2d 777 (1995).

[27] MCR 3.211(B)(3); *Olson v Olson*, 256 Mich App 619, 627; 671 NW2d 64 (2003).

[28] MCL 552.19.

[29] *Stoudemire v Stoudemire*, 248 Mich App 325, 339; 639 NW2d 274 (2001); *Heilman v Heilman*, 95 Mich App 728, 731; 291 NW2d 183 (1980).

[30] *Olson*, 256 Mich App at 627.

[31] *Id*.

[32] *Id*. at 627 n 4.

[T]he party seeking to include the interest in the marital estate bears the burden of proving a reasonably ascertainable value; if the burden is not met, the interest should not be considered an asset subject to division.[33]

## C. APPLYING THE STANDARDS

Beatty-Gray contends that the trial court erred when it awarded Gray part of the value of her eventual property settlement because there was no evidence of the value of the marital portion of the settlement in the record. We agree.

Here, there was no evidence in the record concerning the value of Beatty-Gray's slip and fall claim. There was no evidence regarding what portion of the claim might be marital and what portion might be Beatty-Gray's separate property. Gray had the burden to produce some evidence of the value of this property, and he failed to do so.

We conclude that the trial court should not have included the asset in the marital estate without some evidence of its value.

## V. COSTS AND ATTORNEY FEES

### A. STANDARD OF REVIEW

This Court reviews the findings of fact on which the trial court based its award of attorney fees for clear error.[34] This Court reviews the trial court's decision regarding an award of attorney fees for an abuse of discretion.[35]

### B. LEGAL STANDARDS

Generally, a party may only recover attorney fees from another party if a statute, court rule, or common-law exception provides for them.[36] MCR 3.206(C) provides that a party may request attorney fees in a divorce action and, if doing so, must allege his or her need and the other party's ability to pay:

(1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

(2) A party who requests attorney fees and expenses must allege facts sufficient to show that

---

[33] *Wiand v Wiand*, 178 Mich App 137, 149; 443 NW2d 464 (1989).

[34] *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005).

[35] *Id*.

[36] *Dessart v Burak*, 470 Mich 37, 42; 678 NW2d 615 (2004).

(a) the party is unable to bear the expense of the action, and that the other party is able to pay, . . .

The party seeking attorney fees in a divorce has the burden to establish both financial need and the ability of the other party to pay.[37]

## C. APPLYING THE STANDARDS

Beatty-Gray contends that the trial court erred when it failed to consider her request for attorney fees, given the parties' disparate income and the fact that she presented evidence of her inability to pay. We agree.

The trial court abuses its discretion when a party requests attorney fees and the court fails to consider the specific circumstances of the case, including whether a party will have to invade spousal support and whether the opposing party has an ability to pay the party's attorney fees.[38] Here, Beatty-Gray requested attorney fees. Gray testified that he makes $144,000 a year. Beatty-Gray testified that she had spent $200 an hour on her attorney and owed $31,125.53. Beatty-Gray testified that she made $11,000 in 2012, $26,000 in 2011, and $19,000 in 2010. Beatty-Gray also testified that she owed Hopkins $2,500 and owed Mackenzie $400.

The trial court ordered the parties to pay their own attorney fees. It gave no reason for denying Beatty-Gray's request for expert costs and attorney fees. Given the parties' disparate incomes and the fact that Beatty-Gray's actual yearly income was significantly less than her attorney fees, the trial court should have considered the specific circumstances of the case. On remand, the trial court shall consider Beatty-Gray's ability to bear the expense of this action and Gray's ability to pay when deciding to grant or deny Beatty-Gray's request for attorney fees.

## VI. CONCLUSION

We affirm the trial court's award of joint physical and legal custody to Gray and Beatty-Gray and affirm the trial court's decision to impute income to Beatty-Gray. However, we reverse the trial court's decision to award Gray 10.63% of the value of Beatty-Gray's slip and fall claim when no evidence in the record supported its division, and reverse the trial court's decision to deny Beatty-Gray's request for attorney fees. We remand for the trial court to consider the specific circumstances of this case as they relate to Beatty-Gray's request for attorney fees.

---

[37] MCR 3.206(C)(2)(a); *Ewald*, 292 Mich App at 724.

[38] *Loutts*, 298 Mich App at 25.

We affirm in part, reverse in part, and remand. We do not retain jurisdiction. Neither party having prevailed in full, no costs.[39]

/s/ Patrick M. Meter
/s/ William C. Whitbeck
/s/ Michael J. Riordan

---

[39] MCR 7.219.